IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| v. | § | Cr. No. C-04-702 (1) |
| | § | C.A. No. C-05-402 |
| ELISEO ALEX SARABIA | § | |
| | § | |
| Defendant-Movant. | § | |

**ORDER DENYING MOTION TO VACATE,
SET ASIDE OR CORRECT SENTENCE AND
ORDER DENYING CERTIFICATE OF APPEALABILITY**

Pending before the Court is Eliseo Alex Sarabia's ("Sarabia") motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.[1] (D.E. 21, 26).[2] Also before the Court is the government's response, which moves for the dismissal of Sarabia's motion. (D.E. 27). To date, Sarabia has not filed a response to the motion to dismiss. For the reasons set forth below, Sarabia's § 2255 motion is DENIED. (D.E. 21, 26). Additionally, the Court DENIES Sarabia a Certificate of Appealability.

## I. JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 2255.

## II. BACKGROUND

**A.   Summary of Offense[3]**

On April 28, 2004, Sarabia was driving a vehicle through the U.S. Border Patrol checkpoint

---

[1] Sarabia's motion consist of his initial motion and an amended motion, which the Court gave Sarabia permission to file. (D.E. 21, 26).

[2] Docket entry references are to the criminal case, CR. No. C-04-702.

[3] The summary is taken from Sarabia's Presentence Investigation Report ("PSR") at ¶¶ 3-7.

located south of Sarita, Texas. Within his vehicle were three citizens of Mexico all illegally present within the United States. One was a front seat passenger. The other two were in the rear extended cab area of the vehicle; one was lying on top of some blankets, the other was lying on the floor of the vehicle beneath the blankets. Sarabia admitted that he knew the three individuals were illegal aliens and he stated that he was going to charge each of them $900 to be transported to Dallas. The case was not accepted for prosecution due to guidelines set by the Border Patrol's Corpus Christi Prosecutions Office.

On December 1, 2004, Sarabia entered the same Border Patrol checkpoint in a Pontiac Grand Am. Agents conducted an immigration inspection of the him and his sole passenger. Both appeared nervous and avoided eye contact with the agents during questioning. Thus, the vehicle was referred to the secondary inspection lane for further questioning and investigation, which revealed that his passenger was a citizen of Mexico illegally present in the United States. Sarabia told agents that he was hired to transport the illegal alien to Houston, Texas, and was going to be paid of a fee of $800. He was provided with the transport vehicle from a car lot in Brownsville. The passenger related that she was previously deported from the United States after a conviction of illegal entry. Her husband contacted her in Mexico and advised that he had made arrangements with an unknown person to be smuggled back into the United States. She illegally entered the United States on November 30, 2004 and was taken to a house where she remained for one day. She was then picked up by Sarabia and transported by him to the checkpoint.

### B.     Criminal Proceedings

On December 16, 2004, Sarabia was charged in a single-count indictment with transporting an undocumented alien within the United States, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and

1324(a)(1)(B)(ii), on or about December 1, 2004. (D.E. 9). On January 24, 2005, Sarabia pleaded guilty to the indictment. (D.E. 19). There was no written plea agreement. (Id.).

Pursuant to the Court's instructions, the probation department prepared a Presentence Investigation Report ("PSR"). The PSR calculated Sarabia's base offense level to be a 12. (PSR at ¶ 12). It then increased his offense level by six levels pursuant to U.S.S.G. § 2L1.1(b)(5), because the offense (the earlier transportation of illegal aliens in April 2004) involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person. (PSR at ¶ 13). It then gave him a three-level credit for acceptance of responsibility, resulting in a total offense level of fifteen. (PSR at ¶ 17-21). The scoring of his criminal history resulted in a total of 10 criminal history points, for a criminal history category of V. (PSR at ¶¶ 23-32). The resulting advisory guideline range for a term of imprisonment was 37 to 46 months, and the statutory maximum for the offense was five years. (PSR at ¶¶ 55-56).

Sarabia, through counsel, filed written objections to the PSR. (D.E. 15). Specifically, he objected to the six-level upward adjustment for reckless endangerment pursuant to U.S.S.G. § 2L1.1(b)(5) on a number of grounds. He also objected to some factual recitations in the PSR that did not affect his offense level. (D.E. 15 at 3). These included an objection to paragraph 26, which discussed his prior conviction for aggravated robbery. In its entirety, his written objection to that paragraph reads as follows:

> Mr. Sarabia objects to the facts recited in paragraph 26. Paragraph 26 relates to a conviction Mr. Sarabia sustained in 2002 for aggravated robbery. Mr. Sarabia maintains that the altercation involved his ex-wife and it related to her having stolen money from him earlier in the day when he was an invited guest. Mr. Sarabia had discovered that the

3

> money was removed from his wallet and he went to confront his ex-wife. He admits that the altercation escalated and the police were called.

(D.E. 15 at 3).

Sentencing occurred on March 23, 2005. (D.E. 18; see generally D.E. 24, Sentencing Transcript ("S. Tr.")). The Court upheld the defendant's objections to the six-level enhancement for reckless endangerment. (S. Tr. at 3-4). That resulted in a total offense level of 10, which, coupled with Sarabia's criminal history category of V, resulted in a guideline range of 21 to 27 months.[4] (S. Tr. at 8). The Probation Department recommended an upward departure because of the defendant's history of violence. (S. Tr. at 8). The prosecutor stated that she had no objection to an upward departure. (S. Tr. at 9). Sarabia's counsel argued against an upward departure, raising a number of different arguments with the Court as to why Sarabia instead should receive the low end of the advisory guideline range. (S. Tr. at 9-19).

When the Court asked Sarabia if there was anything he wanted to say, he proceeded to give the Court "his side" of the facts surrounding his prior offense for aggravated robbery. In particular, he reiterated the claim in his written objections that he was taking back money that his ex-wife, Dorina Garza Sarabia, had taken from him earlier the same day. He also gave a detailed account of the events of the day, which differed in some ways from those in the PSR.[5] Finally, he told the Court that his ex-wife wanted to testify on his behalf at his federal sentencing, but that she was afraid of getting in

---

[4] After the Court upheld the objection, the Probation Officer reported the changed levels to the Court. (S. Tr. at 8). It is unclear to the Court now why the offense level would be a 10, instead of 9. That is, the base offense level was 12 minus 3 levels for acceptance of responsibility. Given that the Court departed upward to impose a sentence of 37 months under the advisory guidelines, it is unlikely the miscalculation affected Sarabia's sentence. Moreover, neither Sarabia or his counsel objected at sentencing, and Sarabia did not raise the issue, either on appeal or in his § 2255 motion. Thus, any argument that the Court misapplied the guidelines is waived.

[5] The version of events relayed to the Court at sentencing is set forth in detail infra at pages 10-11.

trouble for having previously filed a false police report about the incident. He stated then (and argues now) that she would corroborate his version of events regarding the aggravated robbery. (See generally S. Tr at 20-23).

After listening to his version of events about that incident, the Court also inquired about several of the other convictions and other criminal conduct in the PSR, and Sarabia admitted some of that conduct, and then did not remember or had "explanations" for some of the other conduct. He also repeatedly claimed that the conduct was the result of his substance abuse problem. (S. Tr. at 24-28).

After considering all the factors under § 3553, the Court determined that it would upwardly depart first to a criminal history category VI and then upward two levels to a 12, or a guideline imprisonment range of 30 to 37 months. (S. Tr. at 31-33). The Court noted a number of factors that supported the upward departure, including Sarabia's history of physical and sexual abuse, his extremely violent and significant criminal history, a clear history and likelihood of recidivism, a likelihood that he would continue to engage in criminal behavior including acts of violence against women and children, the fact that his conduct had not been deterred by probation, supervision or leniency in jail terms, and the Court's finding that his criminal history score underestimated and under-evaluated his criminal history. (S. Tr. at 31-33; see also S. Tr. at 9, 10, 13-14, 17, 18, 29).

The Court sentenced Sarabia to a 37-month term of imprisonment, to be followed by a three-year term of supervised release, and imposed a $100 fine and a $100 special assessment. (D.E. 18). Judgment was entered on April 5, 2005. (D.E. 20).

Sarabia did not appeal. He filed his initial § 2255 motion on August 4, 2005 and, pursuant to the Court's instructions, filed an amended motion on December 1, 2005. (D.E. 21, 26). Utilizing either date, the motion is timely.

### III.  MOVANT'S ALLEGATIONS

Sarabia's grounds for relief can be collapsed into two distinct claims.  First, he argues that he was denied effective assistance of counsel because his counsel failed to investigate and challenge portions of his criminal history during his federal sentencing.  Second, he argues that his counsel was deficient for failing to call his ex-wife or sons to the stand as witnesses at his sentencing.  As discussed in detail herein, he is not entitled to relief as to either of his claims.

### IV.  DISCUSSION

**A.     28 U.S.C. § 2255**

There are four cognizable grounds upon which a federal prisoner may move to vacate, set aside or correct his sentence: (1) constitutional issues, (2) challenges to the district court's jurisdiction to impose the sentence, (3) challenges to the length of a sentence in excess of the statutory maximum, and (4) claims that the sentence is otherwise subject to collateral attack.  28 U.S.C. § 2255; United States v. Placente, 81 F.3d 555, 558 (5th Cir. 1996).  "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice."  United States v. Vaughn, 955 F.2d 367, 368 (5th Cir. 1992).  "[A] collateral challenge may not do service for an appeal."  United States v. Frady, 456 U.S. 152, 165 (1982).

**B.     Ineffective Assistance of Counsel**

Both of Sarabia's claims are ineffective assistance of counsel claims.  Such claims are properly analyzed under the two-prong analysis set forth in Strickland v. Washington, 466 U.S. 668 (1984).  United States v. Willis, 273 F.3d 592, 598 (5th Cir. 2001).  To prevail on a claim of ineffective assistance of counsel, a movant must demonstrate that his counsel's performance was both

deficient and prejudicial. Id. This means that a movant must show that counsel's performance was outside the broad range of what is considered reasonable assistance and that this deficient performance led to an unfair and unreliable conviction and sentence. U.S. v. Dovalina, 262 F.3d 472, 474-75 (5th Cir. 2001).

If the movant fails to prove one prong, it is not necessary to analyze the other. Armstead v. Scott, 37 F.3d 202, 210 (5th Cir. 1994) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one"), cert. denied, 514 U.S. 1071 (1995); Carter v. Johnson, 131 F.3d 452, 463 (5th Cir. 1997) ("Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim.").

In order for Sarabia to show that he suffered prejudice as to a sentencing issue, he must show that there is a reasonable probability that but for counsel's alleged errors, he would have received a lesser sentence. See United States v. Phillips, 210 F.3d 345, 350 (5th Cir. 2000). As discussed herein, there is no evidence to support any contention that, but for his counsel's alleged errors, Sarabia would have received a different sentence.

### 1. Failure to Investigate

Sarabia makes a generic claim that his counsel failed to obtain records and file relating to his prior convictions. Other than the facts he has raised challenging to his criminal history,[6] he does not provide any information as to what the additional investigation would have revealed. His claim fails on this ground alone. United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the

---

[6] To the extent that his is claiming his attorney should have investigated the facts of certain specific portions of the PSR and then brought them to the Court's attention, those claims are addressed in Section IV.B.2. infra.

7

investigation would have revealed and how it would have altered the outcome of the trial."). Moreover, there is no presumption of prejudice based on a failure to investigate. Woodard v. Collins, 898 F.2d 1027, 1029 (5th Cir. 1990). Because Sarabia has not raised any specific facts that would show prejudice as a result of counsel's alleged failure to investigate, this claim fails.

### 2. Failure to Challenge Portions of Criminal History

Sarabia alleges that his attorney was ineffective for failing to challenge three portions of his criminal history referenced in his PSR. The specifics of each of the three portions are addressed in the order he raises them.

#### a. Paragraph 36 – Arrest for Possession of a Controlled Substance

First, Sarabia claims that his counsel should have challenged the inclusion of Paragraph 36 of the PSR, which referenced an arrest on July 24, 1999 for possession of a controlled substance. Sarabia argues that, although police found a hard white substance that they believed to be crack cocaine, later tests of the substance proved it to be "trash, and not cocaine after all." (D.E. 26 at 5). Sarabia claims that the charges were dropped, but complains that he still received criminal history points for this incident. (D.E. 26 at 5). In fact, no points were assigned as a result of this incident. (PSR at ¶ 36). Moreover, there is nothing in the sentencing record to suggest that the Court actually considered this arrest, when it upwardly departed. Additionally, even without this arrest, the remainder of the PSR still supports the Court's conclusion that Sarabia's criminal history was under-represented by his criminal history category of V, and that an upward departure from the advisory guidelines was warranted.

For all of the foregoing reasons, no prejudice resulted from any failure by his counsel to challenge the reference to this arrest in the PSR, and his ineffective assistance claim on this ground

fails.

### b. Paragraph 26 – Conviction for Aggravated Robbery

The second conviction that Sarabia alleges his counsel should have challenged was a conviction for aggravated robbery, for which he was given two criminal history points. (D.E. 26 at 6; see PSR at ¶ 26). According to the PSR, he was represented by counsel for this state offense and pleaded guilty to aggravated robbery. The offense occurred on December 16, 2001. Officers with the Houston Police Department were dispatched to the residence of Dorina Garza Sarabia ("Garza"), Sarabia's ex-wife, in reference to a disturbance involving a weapon. Upon arrival, officers observed the Sarabia attempting to leave the scene and detained him. He shouted to the officers to shoot and kill him several times and also struggled with the officers before being restrained.

According to Garza, Sarabia had arrived at her residence and begun banging on the front door shortly after midnight. She hid with her two sons, ages 14 and 15, in the apartment bathroom. Sarabia then forced his way into the apartment through a window and entered into the bedroom, holding a large kitchen knife. He threatened to kill Garza victim if she did not provide him with money. After she told him she did not have any money, he approached her with the knife, at which time their two sons got between Sarabia and Garza. Sarabia then advised the sons that they were going to lose both their parents that evening. One of the children was able to run to contact the police. The defendant took $17 belonging to Garza from the kitchen. Upon hearing his son on the phone with the police, Sarabia dropped the knife and fled the scene. One of his sons corroborated the events as stated by Garza.

The PSR reflects that Sarabia "maintains that the offense involved his ex-spouse having stolen money from him earlier in the day when he was an invited guest. He states that when he discovered the money was missing he went to confront his ex-wife, which escalated into the police being called to the scene." (PSR at ¶ 26). At sentencing, Sarabia gave the Court details on his version of the

underlying facts of the offense. (S. Tr. at 20-24). According to Sarabia, the facts pertinent to the offense began earlier in the same day. He had received a $600 paycheck and was on his way to pick up his children when he was offered some crack cocaine. He spent $200 of his paycheck on the crack cocaine, which he promptly used. After using the crack, he came to his "senses" around 10 or 11 that night, and went to see Garza. He said that when Garza found out about the drug use, she "blew up" and "hit the ceiling." They "argued" and "cried" and she subsequently told him to take a shower, while she fixed him something to eat. When he got out of the shower, Garza told him to get out of the residence. While he was getting dressed, he noticed that his wallet was in the wrong pocket and the remaining $400 was gone. He asked for $100 of it back, and Garza said she would not give him any money. She called the police at that time and told him to leave, and he did.

He told the Court at sentencing that he returned later that same evening, and began banging on the door and the window, but that his son eventually came to the door and let him in. He and his Garza argued again, and then he began looking around for the money. There was a little bit of money and right with it was a knife, and he picked up both. He then "stepped a couple of feet out into the room." He concluded his story to the Court by saying that "everything else, I guess, in that report did happen." (S. Tr. at 23). "Everything else" would have included: 1) the threats toward Garza and comment to his children about losing both their parents that night; 2) his sons physically intervening between him and Garza, in order to protect her; and 3) one of his sons calling the police.

When the Court asked why he had pleaded guilty to aggravated robbery if his son had let him in the residence, he explained that he was frustrated, tired and aggravated. He stated that he pleaded guilty because his court-appointed lawyer convinced him it would be a better deal than contesting the charge, which would result in time in jail and a probable guilty verdict, according to his attorney. If he pleaded guilty, he received ten years deferred adjudication and could get out of jail that day.

He now urges that his federal counsel was ineffective for failing to challenge the earlier conviction, and for failing to call Garza and his sons to testify regarding the facts underlying the aggravated robbery conviction. He also claims that his attorney made no effort to ask for a continuance so that the Court could hear from these witnesses. He posits that, had his counsel done so, Garza and his sons would have testified that he was let into the house, and that he was merely taking back money that Garza had taken earlier in the evening.

This claim fails because Sarabia cannot show prejudice. Notably, Sarabia does *not* contend that he was not convicted of the offense, nor does he argue that his plea to the aggravated robbery was unknowing or involuntary. Indeed, he reaffirmed at sentencing, under oath, that he pleaded guilty because he believed the plea he was being offered was better than taking his chances at trial. Even if the Court had taken testimony from these witnesses, then, whatever they said would not have changed the fact that Sarabia pleaded guilty to the state offense, admits he did so, and did so with the advice and counsel of his attorney in the state proceedings. Thus, the conviction still would have been scored. Cf. Daniels v. United States, 532 U.S. 374, 382 (2001) (stating general rule that a § 2255 movant may not collaterally attack prior state convictions in the context of a § 2255 motion, with certain exceptions in applicable here).

Moreover, the government correctly notes that claims of uncalled witnesses are "disfavored." United States v. Harris, 408 F.3d 186, 190 (5th Cir. 2005) (citing Buckley v. Collins, 904 F.2d 263, 266 (5th Cir. 1996)). This is because "the presentation of testimonial evidence is a matter of trial strategy and because allegations as to what a witness would have testified to are largely speculative." Schwander v. Blackburn, 750 F.2d 494 (5th Cir. 1985) (citing Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978) and Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 1984)). Although

Sarabia's claim involves testimony at sentencing, rather than at trial, the same concerns are implicated in this case.

These concerns caution against any finding of ineffective assistance of counsel on this ground. As an initial matter, it is not clear that the witnesses were even available to testify. Alexander v. McCotter, 775 F.2d 55, 602 (5th Cir. 1985) (to show prejudice as a result of a failure to call a witness, the movant must show "not only that the testimony would have been favorable, but also that the witness would have testified at trial"). As Sarabia himself told the Court at sentencing, Garza was concerned about testifying because she believed it would place her in jeopardy for having filed a false police report. Thus, it's not even clear that she was available to testify and she may have instead relied on her Fifth Amendment rights and remained silent.

It is also worth noting that any witnesses called by Sarabia's attorney would have been subject to cross-examination. Although Sarabia states that Garza intended to testify favorably for him, there is also a history of violence by him against her, a history that included her staying in a women's shelter to avoid him, obtaining a protective order against him, and later calling the police for assistance when he violated the protective order. Perhaps there were even more incidents of violence not reported to the police, incidents that she could have been required to testify about.

Likewise, his sons' testimony could have been damaging in other respects, too. Indeed, there are two references in the PSR to his sons trying to protect Garza from Sarabia. There could easily have been more such incidents. In short, a lot of damaging testimony could have come in, as well as the positive portrayals that Sarabia expected.

Finally, even if the Court had heard the testimony of Garza and his sons regarding the aggravated robbery, and even if it was consistent with Sarabia's version of events, an upward departure would still have been appropriate. The facts, even as Sarabia conveyed them, still show that

he wielded a knife and threatened to kill Garza. The facts, as he conveyed them, were that he made those threats in front of his teenage children, who were physically trying to protect their mother at the time. As the Court repeatedly noted in its explanation of its upward departure, it was this type of violence against women and children that was reflected throughout his criminal history, which included other assaults on Garza and the violation of a protective order she had obtained against him, an assault against a four-year old child that left the child bruised, and other incidents. It was not this one offense (or even the three items specifically challenged by Sarabia) that caused the Court to upwardly depart. It was his entire history, which included a number of other allegations of violence which Sarabia does not now challenge.

Thus, even if the witnesses had been called and testified as he says, and even if no other testimony damaging to Sarabia was admitted through them, he cannot show a reasonable probability that he would have received a lesser sentence. Cf. Phillips, 210 F.3d at 350 (discussing required showing of prejudice as to sentencing issues). Without such a showing of prejudice, his ineffective assistance claim fails.

Additionally, Sarabia cannot show that his attorney's failure to challenge this conviction or call witnesses fell below an "objective standard of reasonableness," so as to establish the deficiency prong of Strickland. 466 U.S. at 688. As the Fifth Circuit has recently reaffirmed:

> Judicial scrutiny of counsel's performance must be "highly deferential," and the court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's alleged conduct, and to evaluate the conduct from counsel's perspective at the time." ... There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."

United States v. Harris, 408 F.3d 186, 189 (5th Cir. 2005) (citations omitted).

Although the government did not provide an affidavit from his counsel, Sarabia himself indicates the strategy that his counsel was employing by declining to call witnesses on his behalf. Specifically, he says that his attorney did not think that challenging his prior convictions on the facts would be beneficial to him, because it would cause the Court to focus on his prior convictions. Additionally, he says that his attorney expressed to him that he did not believe his story regarding the aggravated robbery.

In evaluating the conduct of Sarabia's counsel at the time of sentencing, these were not objectively unreasonable decisions for him to make. Indeed, Sarabia certainly did himself no favors by conveying his version of the aggravated robbery to the Court. As noted, during his recitation of the facts, he admitted that most of the facts in the offense description were true, but that he was trying to take back his own money. He also informed the Court that he had used money the same day to purchase crack cocaine. His explanation regarding why he picked up the knife, which was essentially that it just happened to be with the money, was simply not credible.

Similarly, there existed a good possibility that damaging testimony would have come in through the witnesses Sarabia thinks should have been called, as discussed above. (See supra at 12-13). Balanced against any helpful testimony they may have provided, it was certainly not objectively unreasonable for his counsel to not call them.

This claim of ineffective assistance of counsel fails.

### c.    Paragraph 25 – Assault Causing Bodily Injury

Sarabia was also scored one history point for a second incident involving Garza and their children, which led to a conviction for assault causing bodily injury. (PSR at ¶ 25). The PSR relies on the offense report, which reported that, on January 23, 1999, officers were called to an address in reference to an assault. Officers observed Sarabia leaving the scene in a vehicle. Garza was

contacted and observed to have two lacerations over her right eye. She reported that Sarabia had committed several crimes against her since their divorce three months earlier and that she was in the process of awaiting a final protective order to be issued. She told police that she had entered into a women's shelter on a previous occasion to avoid contact with the defendant. (PSR at ¶ 25).

Garza alleged that, on the date of the offense, Sarabia had been returning the children to Garza's residence and became angry when Garza declined to try to reconcile their relationship. Sarabia became violent and struck her with a closed fist. According to Garza, her two sons attempted to stop Sarabia from assaulting Garza and called the police for assistance. Officers also reported charges of injury to a child due to the defendant assaulting his children. (PSR at ¶ 25).

In his § 2255 motion, Sarabia claims that "he did not intentionally hit [his] son" during that incident, and that he has never been a threat to "them."[7] (D.E. 26 at 8). He claims that his counsel was ineffective for failing to challenge this conviction, which he deems an "unlawful enhancement." (Id.). Sarabia's claim is without merit. The assault conviction was for the assault against Dorina Sarabia, which he does not dispute occurred. It was properly scored and considered as part of his criminal history. Thus, he was not prejudiced by his counsel's failure to challenge this conviction. See United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

### 3.     Failure to Call Witnesses

In addition to Sarabia's allegation that his ex-wife and sons would have supported his version of events regarding specific offenses, such as the aggravated robbery, he also appears to be claiming

---

[7] It is not clear from the context, but the word "them" appears to be a reference either to his sons or to children in general. (See D.E. 26 at 8).

that they should have been called to testify as to his general character. He claims they could have given a more accurate portrayal of him. As noted previously, claims of uncalled witnesses are disfavored. See Harris, 408 F.3d at 190. Sarabia does not submit any affidavits of those witnesses as to what their purported testimony would have been. Moreover, the potential problems associated with those witnesses testifying, see supra at 12-13, lead to the conclusion that his attorney was not objectively unreasonable in failing to call them. Cf. Harris, 408 F.3d at 189.

For all of the foregoing reasons, Sarabia's ineffective assistance claims fail.

### C.     **Certificate of Appealability**

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Sarabia has not yet filed a notice of appeal, this Court nonetheless addresses whether he would be entitled to a COA. See Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000) (a district court may *sua sponte* rule on a COA because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A COA "may issue...only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). To warrant a grant of the certificate as to claims denied on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). This standard requires a § 2255 movant to demonstrate that reasonable jurists could debate

whether the motion should have been resolved differently, or that the issues presented deserved encouragement to proceed further. United States v. Jones, 287 F.3d 325, 329 (5th Cir. 2002) (relying upon Slack, 529 U.S. at 483-84).

The Court concludes that reasonable jurists could not debate the denial of Sarabia's § 2255 motion on substantive grounds nor find that the issues presented are adequate to deserve encouragement to proceed. Miller-El, 123 S. Ct. at 1034 (citing Slack, 529 U.S. at 484). Accordingly, Sarabia is not entitled to a COA as to his claims.

## V. CONCLUSION

For the aforementioned reasons, Sarabia's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (D.E. 21, 26) is DENIED. Additionally, Sarabia is DENIED a Certificate of Appealability.

ORDERED this 10th day of April, 2006.

_____
Janis Graham Jack
United States District Judge